NOVEMBER 1, 2004

OFFICE OF THE CLERK-MAGISTRATE
U.S. DISTRICT COURT
United States Courthouse
One Courthouse Way, Suite 2300
BOSTON, MASS 02109

Dear Clerk.

Please be advised that I am seeking Relief from Judgement under 28 U.S.C.A, 2244(b)(3) of Federal Rules Civil procedure, rule 60(b), 28 USCA.

I am seeking relief based upon the followings Grounds:
A.) I have submitted to this Honorable Court, A Petetition Sent to the <u>Massachusetts Supreme Judicial Court</u>, and the Court has Not filed a response to my petetion, despite my requesting a <u>Habeas Corpus</u> and, A copy of this petetion was Also Sent to the Suffolk County Districts Attorney's office.

In Addition, I respectfully request that this Court rule on the enclosed petetion, along with the Attached motions. I Also request this Honorable Court to Grant me the following.

A) A Habeaus Corpus to federal Court
B) A Evidentiary Hearing on enclosed petetion
C) A Lawyer to represent me, should the Courts Approved my Requst
D.) A New trial, if after reviewing the enclosed petetion, this Honorable Court, determines that a New trial be Granted

COMMONWEALTH OF MASSACHUSETTS

V.

WILLIAM J. CURRY

SUFFOLK, SS
COURT

SUPERIOR

INDICTMENT NO(S)
SUCR 1996-10693
SUCR 1996-10694

DEFENDANT'S APPEAL TO THE
MASSACHUSETTS SUPREME JUDICIAL COURT

MASSACHUSETTS APPEALS COURT
CASE NO. 2000 - P - 424
SUBMITTED MAY 12, 2000
DECIDED JULY 12, 2001

Date:_____

DEFENDANT / APPELLANT

_____

WILLIAM J. CURRY
COMMITMENT NO. W-65351

③

Office of The Clerk
Massachusetts Supreme Judicial Court
One Beacon Street
Boston, Mass 02108


RE:  Commonwealth v. William J. Curry
     Indictment No(s.) SUCR 1996-10963 & SUCR 1996-10964
              Suffolk County Superior Court


Dear Clerk:


I am addressing this legal correspondence to this Honorable Court, requesting that this
Court review the following twelve issues I have raised in this legal letter, and consider
ordering a new trial or throwing out my convictions on the above entitled indictments, as
reason therefore, I believe that I was not given a fair trial, I was represented inadequately
by counsel, and subjected to a biased and prejudiced judge, in violation of my various
constitutional rights.

This request is based upon significant amounts of evidence which I have submitted to this
Honorable Court, that proves that the State did not prove its case beyond a reasonable
doubt, and therefore my convictions are illegal.

Based upon the record, legal documents contained in this package I believe that it would
be in the best interest of this Honorable Court, and in fairness and interest of justice, that
this court review my entire case on its on motion, in addition to my request to have this
court look at my case.

I am respectfully requesting that the court, because of constitutional importance carefully
review the issues I have presented to this court.

In addition, in Baeta v. Banks, (2003) Case number 02-8286, State of Pennsylvania, the
United States Supreme Court overturned a man's deathrow conviction, because the justice
ruled that "when police or prosecutors conceal significant exculpatory or impeaching
evidence and/or material that is favorable to the defendant, it is ordinarily incumbent upon
the State to set the record straight."


The Court also ruled that "a rule declaring prosecutors may hide, defendant's must seek;
is not tenable in a system that is constitutionally bound to accord defendant's due process."

1

In my particular case, the <u>Massachusetts Appeals Court</u>, should have set the record straight when the trial judge, and the prosecutor became aware of <u>DNA evidence favorable to me</u>, when the trial judge denied into evidence <u>the Boston Police incident reports</u>, which were favorable to the defense <u>in an exculpatory nature</u>, and when the trial judge <u>failed to give fresh complaint instructions</u> to the jury.

The fact that the trial judge told members of the jury, that they must rely upon their own collective memory of the testimony to find the facts of this case, made the trial fundamentally unfair, and may have serious confounded the jury in their deliberations, which I believe created a substantial miscarriage of justice.

I would again request that this Honorable Court review my case, and consider overturning my convictions and ordering a new trial or throw out my convictions completely.

I thank you for your time and consideration in this matter.

Sincerly,

William J. Curry

_____

SUFFOLK,  ss                                          SUPERIORCOURTDEPARTMENT


                                                      INDICTMENTS No(s)


COMMONWEALTH
            vs.                                        SUCR 96-10963
WILLIAM J. CURRY                                       SUCR 96-10-964


<u>MOTION FOR EVIDENTIARY HEARING</u>
<u>ON DEFENDANT'S MOTION FOR A NEW TRIAL</u>

The defendant moves, Pursuant to <u>Commonwealth v. Licata,</u> 412 Mass. 654, 660-662, 591 N.E.2d 672, 676-677 (1992), that this Honorable Court grant him an evidentiary hearing on his Motion for a new trial.  As reasons therefore,

1.)    The defendant has filed a motion for a new trial with supporting affidavit.

2.)    Such an affidavit raises serious questions and issues of Constitutional Importance, in that defendant claims that he was not rendered the effective assistance of counsel that is required under due process, which violates the defendant's Sixth Amendment rights.  Please   see Motion for a new trial and supporting affidavit attached hereto.


                                            _____
                                                      William J. Curry
                                                      Pro-se Defendant

Date: _____


<u>COMMONWEALTH OF MASSACHUSETTS</u>


2

SUFFOLK,  ss.                                               SUPERIOR COURT


COMMONWEALTH

                                                  INDICTMENT NO(S)
                                                  SUCR 96-10963
        vs.                                       SUCR 96-10963


WILLIAM J. CURRY


## MOTION FOR NEW TRIAL PURSUANT TO
## MASS. RULES CRIM PROCEDURE RULE 30(b)


The defendant moves, pursuant to Mass.R.Crim.P. 30(b),   that he be granted a new
trial on the above-entitled matter.

As reasons therefore, defendant's claim of ineffective assistance of counsel violated his
right to due process of law, see, attached affidavit in support of defendant's Motion for a
new trial.


                                        _____
                                              William J. Curry
                                              Pro-se Defendant


        Date: _____

Office of The Clerk-Magistrate
Suffolk Superior Courthouse
90 Devonshire Street
Criminal Business Division
Boston, MA., 02109


June 1, 2004


RE:    COM V. WILLIAM J. CURRY
       INDICTMENT NO(s) SUCR 1996-10963 & SUCR 1996-10964


Dear Clerk:


Enclosed please find, for the convience of this Court, (A) Motion for Appointment of Appellate Counsel, and a motion for evidentiary hearing.

Please be advised that I am seeking a reversal of my convictions and looking for this Honorable Court to grant me a new trial. I have included a brief summary of why I believe this Court should grant me a new trial.

Wherefore, the defendant, William J. Curry, respectfully request and prays that this Honorable Court approve his petition to this Court.


                                                          Sincerely,


                                                          _____

                                                          William J. Curry

# Commonwealth of Massachusetts
## County of Suffolk
### The Superior Court

CRIMINAL DOCKET# **SUCR1996-10963**

RE:   **Commonwealth v Curry, William**

TO: William Curry, pro se
Souza-Baranowski Correctional Center
Post Office Box 8000
Shirley, MA 01464

## CLERK'S NOTICE

This is to notify you that in the above referenced case the Court's action on 06/18/2004 is as follows:

Deft files pro se: motion for appointment of Appellate Counsel. (Ford, J notified w/copy and docket sheets)

**Motion (P#62) denied. Ford, J.**

Dated at Boston, Massachusetts this 23rd day of June, 2004.

John A. Nucci,
Clerk of the Courts

Location: CtRm 8 (Suffolk Courthouse, P.O. Square, Boston)

# Commonwealth of Massachusetts
## County of Suffolk
## The Superior Court

CRIMINAL DOCKET# **SUCR1996-10963**

RE: **Commonwealth v Curry, William**

TO: William Curry, pro se
Souza-Baranowski Correctional Center
Post Office Box 8000
Shirley, MA 01464

## CLERK'S NOTICE

This is to notify you that in the above referenced case the Court's action on 06/18/2004 is as follows:

Deft files pro se: motion for evidentiary hearing on deft's motion for new trial. (Ford, J notified w/copy and docket sheets)

**Motion (P#63) denied. Ford, J.**

Dated at Boston, Massachusetts this 23rd day of June, 2004.

John A. Nucci,
Clerk of the Courts

Location: CtRm 8 (Suffolk Courthouse, P.O. Square, Boston)

# Commonwealth of Massachusetts
## County of Suffolk
## The Superior Court

CRIMINAL DOCKET# **SUCR1996-10963**

RE: **Commonwealth v Curry, William**

TO:   William Curry, pro se
      Souza-Baranowski Correctional Center
      Post Office Box 8000
      Shirley, MA 01464

---

### CLERK'S NOTICE

This is to notify you that in the above referenced case the Court's action on 06/18/2004 is as follows:

Deft files pro se: motion for a new trial. (Ford, J notified w/copy and docket sheets)

**Motion (P#64) denied. Ford, J.**

Dated at Boston, Massachusetts this 23rd day of June, 2004.

John A. Nucci,
Clerk of the Courts

Location: CtRm 8 (Suffolk Courthouse, P.O. Square, Boston)

1. My conviction was obtained by the failure of the prosecutors to turn over exculpatory evidence which was favorable to me. Specifically that the prosecutor deliberately and intentionally failed to turn over a Boston Police incident report to my trial lawyer.

2. My conviction was obtained pursuant to an unconstitutional search and seizure. The Boston Police entered into my residence without a search warrant and illegally seized items of clothing. The articles of clothing were used at trial as evidence, the clothes were unrelated to this case.

3. My trial lawyer failed to argue on my behalf DNA evidence favorable to me. I believe the DNA evidence would have made a significant impact upon my conviction at trial.

4. The trial judge committed prejudicial error in allowing the prosecutor to join indictments for two unrelated sexual assault offenses.

5. The prosecution's closing argument which vouched for the credibility of witnesses and argued matters not in evidence was calculated to inflame the jury and prejudice the accuseds right to a fair trial.

6. Defective jury instructions on "fresh complaint" and lack of jury instructions on "lesser included offenses" created a substantial risk of a miscarriage of justice.

7. The judge committed prejudicial error in determining that the accused's statement was voluntary and permitting the statement to be presented to the jury.

8. Whether my 4th Amendment right was violated in protecting me from unreasonable searches and seizures as it related to this case in the context of this article.

9. Whether my 5th Amendment right not to self-incriminate myself fell well beyond the scope of this article as it relates to this particular case under these circumstances in which police held me for nearly 3 hours before questioning me.

10. Whether my 6th Amendment right was violated in the context of this amendment in that (A) was I adequately offered a good defense to prepare fully for this case, and whether lawyer's conduct fell well below the meaning of effective counsel assistance under this article. (B) did the trial judge deprive me of a guaranteed fair trial when he chose to allow the prosecution to join two unrelated sexual assault offenses together in the context of this amendment.

11. Whether my 8th Amendment right was violated in the context of this article in that, (A) the sentence handed down to me was excessive and (B) whether it constituted cruel and unusual punishment.

1

12.    Whether my <u>14th Amendment right</u> was violated in the context of this amendment in that (A) did the State, under the equal protection clause deny me equal protection under law, and (B) under the due process clause, did the State deprive me of a fair trial by abridging my rights and immunities without due process of law.

I would also request that this Honorable Court consider other factors related to this case as well, including the enclosed documents.

#1.    I have submitted to this Honorable Court, a signed legal document, by Lieutenant Marie Donahue, of the Boston Police Department's sexual assault unit. This signed document included alleged statements that I supposedly made of incriminating statements which led to my confessions of the alleged crimes.

As this Honorable Court can see, it is alleged that I also made statements of committing and attempting suicide. It was at this point, after the suicide attempt, according to Lieutenant Marie Donahue, that I made the statements before this Honorable Court. A little common sense tells us, that anyone who attempts to kill themselves in the manner, that is alleged in this legal document, is clearly not capable of making a two page confession, without being under some kind of stress or psychological duress. Furthermore, Lieutenant Marie Donahue claims, that I told her, that I had dropped two toothbrushes while running away from the scene. <u>This is not true</u>. In fact, at the trial, Criminologist Donald S. Haynes, tested the toothbrushes and found no fingerprints on them. This is all on record. (Check trial transcripts, dated October 1, 1998, pp 176-177)

#2.    With regard to the identification procedure used by Boston Police in making a selection of suspects, I believe that there exists a high degree of suggestive identification used here. Mr. Counsel, the eyewitness who selected my photograph after viewing 19 photographs raises serious questions about the procedures used here in this particular case. First. At Mr. Counsel's own admission, Mr. Counsel told police that I used to be his camp counselor, I lived in the neighborhood, and that he had seen me earlier in the day. This witness was very familiar with me, and in fact, I've known Mr. Counsel and his family for a number of years. Second, at 17 years of age, most individuals would be able to identify their next door neighbor without having to look at 19 photographs, and finally, the procedures used here by the Boston Police suggest possible bias, and needs to be carefully reviewed. I would suggest and request, that this Honorable Court respectfully review and examine this issue throughly.

#3.    The trial judge had serious questions about certain items of clothing that were submitted at trial by the prosection. Even the prosecutor had to admit, that there were numerous articles of clothing illegally seized, that were not relevant to this case. The trial judge made it quite clear, that he thought it was a waste of time,

2

for the clothes to be admitted into evidence. Even my defense lawyer "had no objection if it all goes in" (see trial transcripts dated Day 2, trial, Oct 1, 1998 pp 76, 77).

I question why my defense lawyer did not forcibly argue that the clothing, which was illegally seized, should not be admitted into evidence at trial. He did not argue this issue at the suppression hearing in front of Judge Barbara J. Rouse, on August 5, 1998. He did not pursue this issue during the trial, despite repeated request by me to do so, in front of trial judge Daniel Ford. Why counsel never pursued this issue is a mystery, which I cannot explain to this Honorable court. However, for a trial lawyer, with several years of experience, in dealing with these types of situation, this behavior is not acceptable and this conduct falls well below the guidelines required under the Sixth Amendment of the U.S. Constitution, to provide defendant with an adequate defense to prepare his/her case, and such conduct could constitute ineffective assistance of counsel.

#4.    The DNA evidence in this case is quite clear. There is simply no scientific, or forensic evidence in this case, as testified to by Senior Criminologist Donald S. Haynes, and DNA Expert Joseph Varlaro that links me to this crime. Trial Counsel, under these circumstances should have forcibly argued in my behalf, which he did not do. I question trial lawyer's motives and intent behind such and incident, which would normally be a defense lawyer's best argument and tool to vindicate his client, especially in a case such as this, where the nature and circumstances of these charges are view upon with disgust. Why trial lawyer chose not to use this avenue puzzles me a great deal.

#5.    In addition, in Baeta vs. Banks (2003)
                      State of Pennsylvania
                      Case file No. 02-8286
The U.S. Supreme Court overturned a man's deathrow conviction because the court ruled that "when police or prosecutors conceal significant exculpatory or impeaching evidence/material, it is ordinarily incumbent upon the State to set the record straight." The Court also reasoned that "a rule declaring prosecutors may hide, defendants must seek; is not tenable in a system constitutionally abound to accord defendants due process."

In this particular case at bar, because the police reports were not entered into evidence as exhibits, and therefore not allowed to be given to defense, constituted a miscarriage of justice.
Com v. Montgomery, 52 Mass.App. 831, 836, 755 NE2d 1288, 1292 (2001)
Com v. Barros, 56 Mass. 675, 678-679, 779 NE2d 693, 696 (2002)
(Suppressing physical evidence obtained as direct result of Miranda violation)

Com v. Florek, 48 Mass.App. 414, 418-419, 722 NE2d 20, 24 (2000)
When defendant objects at trial, the Commonwealth is required to prove

3

affirmatively that defendant's statements were properly obtained and that defendant waived his/her rights under Miranda, even if defendant's motion to suppress the statements were untimely. (Judgement reversed, and verdicts set aside, case remanded for a new trial).

## Knowing, Intelligent, and Voluntary.

Com v. Freeman, 430 Mass. 111, 114, 712 NE2d 1135, 1140 (1999) Judgement affirmed.

Com v. Beland, 436 Mass. 273, 281, 764 NE2d 324, 331-332 (2002) Judgement affirmed.

Com v. Ortiz, 435 Mass. 569, 577, 760 NE2d 282, 288-289 (2002) Judgement affirmed.

Com v. Burgess, 434 Mass. 307, 314, 749 NE2d 112, 118 (2001) Judgement affirmed.

Com v. DiMarzio, 436 Mass. 1012, 767 NE2d 1059 (2002) Judgement set aside, new trial ordered.

Police reports are "mandatory discovery" under Rule 14 if the police officer was a witness at the grand jury or if the report consists of exculpatory evidence or of a defendant's statement. Additionally, police reports are subject to disclosure at trial if a police witness wrote it or testifies from it. In the case at bar, Detective Richard Grafton, was allowed to read from these reports at trial by judge Daniel A. Ford. The defendant as well as members of the jury were entitled to view these reports for credibility purposes only. The defendant should have been allowed to impeach the credibility of the States key witness, because such reports were not entered into evidence as exhibits, this was a direct violation of Mass.Crim Rules of Court Procedures, Rule 14. The police report contained exculpatory evidence that was favorable to the defense.

Com v. Van Melkebeke, 48 Mass. App. 364, 366, 720 NE2d 834, 837 (1999). Even in circumstances where Miranda warnings are not necessary, the question of the voluntariness of defendant's statements remains an issue which must be considered separately.

Com v. Rodriguez, 378 Mass. 296, 302-305, 391 NE2d 893-895 (1979) (improper for police to seize items not listed in warrant and not connected with crime) (Judgement reversed, verdicts set aside, new trial ordered)

Com v. Bishop, 402 Mass. 449, 451, 523 NE2d 779-780 (1998) Art.14 Mass Constitution requires inventory search to be conducted pursuant to standard police procedure which hereafter must be in writing. (Judgement reversed, case remanded to Superior Court for new trial)

Com v. Ellerbe, 430 Mass. 769, 772-777, 723 NE2d 977, 9800-983 (2000) (Affirmed

4

in part, reversed in part, remanded to Superior Court)

<u>Com v. Cole</u>, (1980) 380 Mass. 30, 39-43 402 NE2d 55-63

<u>Com v. Riveiro</u>, 393 Mass. 224, 471 NE2d 43 (1984)
Conviction was reversed because trial judge did not conduct voir dire hearing on Miranda warnings outside presence of jury.

<u>Com v. Woodward</u>, 694 NE2d 1277, 427, Mass. 659
Defendant is entitled to relief for Commonwealth's failure to preserve evidence if she establishes reasonable possibility, based upon concrete evidence rather than fertile imagination, that access to the evidence would have produced evidence favorable to her cause.

Under M.G.L., Rules of Criminal Procedure, Rule 14, any witness or victim statements in possession, custody or control of a government agent, the defendant is entitled to exculpatory evidence favorable to the defense.

<u>Com v. Van Melkebeke</u>, 48 Mass.App. 364, 366, 720 NE2d 834, 837 (1999). Even in circumstances where Miranda warnings are not necessary, the question of the voluntariness of the defendant's statements remains an issue which must be considered separately.

<u>Com v. Jones</u>, 439 Mass. 249, 257, 786 NE2d 1197, 1205 (2003)
<u>Com v. Jackson</u>, 432 Mass. 82, 86-87, 731 NE2d 1066, 1070 (2000)
<u>Com v. Bryd</u>, 52 Mass.App. 642, 645-646 NE2d 785, 788 (2001)
Once the issue of voluntariness is raised by the defendant, due process had been held to require a separate inquiry into the voluntariness of defendant's statement, apart from the validity of the Miranda warning.

<u>In united States v. Bautista</u> (2004) <u>Case No. 02-50664</u> the Court, in part, vacated conviction, because the Court ruled that "the police officer's entry into defendant's motel room was a warrantless intrusion unsupported by probable cause.

5

# Boston

**Page:** 01 of 01
**Date:** 05/18/96
**C.C.#** 60-236973

**To:**      Captain Thomas Crowley
Commander, District Six

**From:**    Sergeant Detective James J. Wyse
District Six Detective Unit

**Subject:** Rape Investigation: Photo Identification
(John C. Council Interview)

**Dear Sir:**

Relative to the on going Rape Investigation of an 11 year old child that occurred on 05/18/96 in the vicinity of the Paul A. Dever School,  Dorchester, I respectfully report the following information obtained from John C. Council (B/M/15, D.O.B. 05/20/81, 63 Westwind Road,  Dorchester,  Tel. # 288-2390).

Mr. Council informed me that on this date, 05/28/96, sometime between 1630 hours or 1700 hours,  he was in the school yard of the Paul A. Dever School with another friend.  At about this time he observed a black male known to him as William Curry.  Mr. Council then advised me that this individual use to be his camp councilor a couple of years ago and that he use to live in the neighborhood. At the time he saw him he was on the steps of the school playing with a young boy of about 11 or 14 years of age.  After making eye contact with Mr. Curry, Mr. Curry waived at him and then led the young boy to the back of the school yard where they climbed the fence and then started walking in the direction of B.C. High.

After conveying this information,  I requested that Mr. Council view some photographs.  After viewing an array of 19 photographs,  Mr. Council immediately selected the photograph William Curry.  This selection was made in the company of Lieutenant Detective Marie Donahue, of the Sexual Assault Unit, and Sergeant Detective Daniel Downey.

Respectfully submitted,

*[signature]*

Printed on recycled paper

May 19, 1996

CASE UPDATE

Victim:  Brian Butts
CC# 60-236973

On Saturday, May 18, 1996, Lieutenant Marie Donahue, along with Detective Richard Grafton of the Sexual Assault Unit interviewed William Curry at Area C-11.  Interview commenced at 10:25 PM and ended at 1:30AM on 5-19-96.  Refer to update of Det. Richard Grafton.

William Curry was booked at Area C-11 at approximately 1:45AM.  Prior to being booked, Mr. Curry indicated that he wanted to commit suicide.  Shortly after the booking process William Curry was found in his cell with his head in the toilet and removed from the cell. He was then secured in an area outside the cell block to be monitored.

Lieutenant Marie Donahue was completing reports at about 2:40AM, 5-19-96, a short distance from where William Curry was secured.  At that time, around 2:45AM, William Curry asked Lieutenant Donahue if he could talk about the case and wanted to know how Brian was doing.  Detective Grafton had been relieved of duty at approximately 2:30AM. William Curry went on the state the following to Lieutenant Marie Donahue.  William Curry stated that Brian was devastated during the assault. "I had my hand over his mouth and he asked me not to kill him.  He said he'd do anything as long as I didn't kill him.".  Curry stated that he told Brian that he would kill himself and they wouldn't be able to prosecute him if Brian said anything.  Curry went on to say: Brian had a lot of trust in me and I knew it right away.  I talked to a lot of kids but none showed me the affection that Brian did.  That's why I chose Brian.  Some kids are really vulnerable.  I manipulated Brian's father.  He put a lot of trust in me by letting me come to his house and trusted me by allowing his son to go somewhere with someone he really didn't know a lot about.  He's probably saying I should have known.  I should have checked it out.  I developed a pattern of going after blond boys with blue eyes.  Brian didn't have blue eyes though, his eyes were brown.  I don't go after black boys.  Brian panicked because he thought I was going to kill him.  Brian hit me with a rock 3 or 4 times in the head and hand and I got really angry.  If I caught up to him I would have really hurt him.  He would have spent a few days in the hospital.  Brian isn't all that innocent.  He knows a lot about sex.
I know I'm guilty for what I did to Brian.  It's the thrill of it.  I have to see Brian one more time to tell him it wasn't his fault.
He went on to state that Brian wasn't the only boy he has molested.  He returned to the subject of Jonathan and stated the following.  In May or June of 1995 there was an event at the Bayside Expo Center, a 3 on 3 basketball tournament.  He took Jonathan, a 12 or 13 year old boy he knew from his neighborhood at Harbor Point, into a wooded area behind the JFK Library at knifepoint.  He said he raped him and told Jonathan that if he told anyone he'd kill his family.  Mr. Curry went on to say that on Saturday, 5-18-96, Jonathan was supposed to

meet him in the area of the Dever School. He was going to make Jonathan watch him rape Brian and was then going to make Jonathan rape Brian. Jonathan didn't show up. He stated Jonathan is a Hispanic boy who lives near his mother. He goes to the Grover Cleveland School and is in the 6th or 7th grade. His sister Stephanie knows Jonathan.

William Curry also volunteered that the things they said he did to his niece Tanisha were true and that he did molest her. He stated that there was another blond boy with blue eyes from Harbor Point named Chris that he molested. Curry stated that in February of 1995 he was employed as a counselor at the Agassiz Community Center after school program. During the February vacation he states he took Christopher with him to an outing. Chris was wearing gold rimmed glasses and had a green bike. He stated he didn't rape him but there was some inappropriate touching. He said there was another incident with Chris at Curry's mother's house. He and Chris were in the upstairs bedroom and Curry got on top of Chris from behind. Both were clothed and Curry stated that the rubbed his body against the boy's backside. Mr. Curry stated that Billy Stewart a Probation Officer from Dorchester Court knows Chris's family and filed a 51A on Chris's mother because she let her son near Curry after she was told he molested kids. Curry gave the phone number of Chris as 436-7109.

William Curry went on to say that he wanted to die because people like him can't be cured. He stated that if they don't kill him or keep him in jail he'll keep molesting kids. He said he would kill himself somehow.

William Curry stated that he informed Ms. Pierce, his Probation Officer at Dorchester Court when he was released from jail on 5-8-96 that he was planning on seeing kids and starting a basketball team. She told him it would not be in his best interest to do so. He stated he also told the Court Clinic that he was going to be with kids and was not offered counseling. Mr. Curry was asked if he dropped anything at the scene and he stated that he dropped two toothbrushes that he had from the Shattuck Shelter. He dropped them when he was running away. The conversation terminated at 4:00AM, 5-19-96.

Lt. Marie Donahue

May 19, 1996

Subject:  Investigation of CC# 60-236973 - Brian Butts

The following evidence taken from suspect William Curry sent to the Crime Lab for analysis.

1 - pair white/grey striped men's boxer shorts
1 - pair white jockey underpants, reddish stains
1 - pair navy blue cut-off jeans Calvin Klein
1 - men's purple short sleeved shirt, flowered print
1 - pair men's white sneakers, Reebock
1 - men's fleeced top, black/blue/maroon
1 - men's light blue denim jeans, Riders, grass and dirt stained, black belt
1 - navy blue vest
1 - white thermal shirt long sleeved
1 - pair black suede shoes, men's
1 - purple leather or vinyl jacket
1 - hairbrush
1 - navy baseball cap, "B"
1 - Rape Kit, N.E.M.C.

*RN AT*
*IE*
*ARREST*

*CRIME SCENE PROCESSED BY SGT. DANIEL*
*DOWNEY OF C-11 WITH CRIME LAB AND*
*ID UNIT RESPONDING.*
*REPORT TO FOLLOW FROM SGT. DOWNEY.*

1    bag.  Can you tell us what it states on the outside of

2    that bag?

3  A    "One white thermal shirt and one navy vest."

4  Q    And could you please open that bag.

5  A    (Witness complied.)

6  Q    And is that the vest that was taken from the Shattuck

7    shelter from William Curry's belongings?

8  A    Yes.

9         MS. LYONS:  Your Honor, the Commonwealth would

10    move to have that introduced.

11         MR. HOWARD:  No objection.

12         THE COURT:  May I see counsel at sidebar?

13

14  SIDE-BAR CONFERENCE:

15         THE COURT:  What's the point of all this stuff?

16    All this stuff that came from the shelter, does that have

17    anything to do with this case?

18         MS. LYONS:  Yes.  It was the clothes that the

19    defendant had on, that the victim identified him wearing:

20    the hat, the coat, the shoes, the sneakers.

21         THE COURT:  What about the vest, the vest and

22    the shirt?  How does this matter?

23         MS. LYONS:  Well, I was just putting in

24    everything that was seized from the defendant.

77

1          THE COURT:  Why?  Why?  What's the reason for

2    putting it all in?   Can't you confine it to the stuff

3    that was seized that's relevant to the case?

4          MS. LYONS:  Well, up until this point, I

5    thought all of it was relevant.

6          THE COURT:  Well, it may have been.  But what

7    about this item?  How is this relevant?

8          MS. LYONS:  Well, perhaps this item was not

9    relevant to the case.  I was just putting in everything

10   that we had seized from Mr. Curry.

11         MR. HOWARD:  I have no objection if it all

12   comes in, Judge.

13         THE COURT:  Fine.  I think it's a waste of time

14   and a waste of effort.

15         MR. HOWARD:  I think so.

16         THE COURT:  And the clerk's office will have

17   all this junk downstairs, but if there's some relevance

18   to it...

19         MS. LYONS:  The only thing, there's -- in

20   looking at the boxes, if there's any chance that I get a

21   recess, I'm looking for something that isn't there.

22         THE COURT:  What is it?

23         MS. LYONS:  The victim's shorts, the underwear.

24         MR. HOWARD:  But that wouldn't be amongst his

150

1    also, I sampled some of the bristles from the toothbrush,

2    each toothbrush, so I do recognize the toothbrushes.

3              MS. LYONS:  At this time, I would ask those

4    toothbrushes to be moved into evidence.—

5              MR. HOWARD:  I have no objection.

6              THE COURT:  All right.

7              MS. LYONS:  Thank you.

8              THE COURT:  We'll mark them collectively as the

9    next exhibit.

10                   (Two toothbrushes marked into

11                   evidence as Exhibit Number 32.)

12   Q   Mr. Hayes, what else did you collect from the scene?

13   A   I collected a soil sample, I collected a white sock, and

14       a crumpled piece of tissue paper.

15   Q   And did you do any testing that you just stated?

16   A   Yes.

17   Q   The sock?

18   A   Yes.  I examined the sock, looking for stains.

19   Q   And what did you find?

20   A   I found -- in particular, I was looking for bloodstains

21       or semen stains.  I found no bloodstains or semen stains

22       on the sock.

23   Q   And with regards to the white tissue?

24   A   The white tissue, again I was looking for stained areas

151

1    on the white tissue.  And I found some -- the tissue was

2    soiled and did have some stains.  I did testing on that

3    for the presence semen.

4  Q  And did you find any?

5  A  No.  I found no semen on the tissue.

6  Q  And, Mr. Hayes, you were also given some items that were

7     taken at New England Medical Center from Brian Butts and

8     delivered to the crime lab from Detective Tom Keeley?

9  A  Yes, that is correct.

10 Q  And could you tell us what was inside of that sexual

11    assault kit and what your findings were?

12 A  One of the items submitted by Detective Keeley was a

13    sexual assault kit, and inside the kit were two

14    microscope smear slides, microscope glass slides, which

15    had smears on them that were prepared from oral swabbings

16    and rectal swabbings of Brian Butts.  There were four

17    swabs present inside the kit that were two oral swabs and

18    two rectal swabs that were collected from Brian Butts, a

19    blood sample of Brian Butts, hair samples -- a head hair

20    sample from Brian Butts was in the sexual assault kit,

21    also fingernail scrapings, and a foreign material

22    collection envelope was also present in the sexual

23    assault kit.

24 Q  Thank you.  And, Mr. Hayes, did you do any testing on the

152

1      smear slides?

2    A    Yes, I did.

3    Q    And what were the results?

4    A    I did microscopic examinations of the smear slides and

5         did not observe any sperm cells present on the smear

6         slides, the oral or rectal smear slides.

7    Q    And with regards to the other four swabs?

8    A    The four swabs that were submitted, I did chemical

9         testing and microscopic examinations, looking for the

10        presence of semen.  I was unable to detect the presence

11        of semen.  There was no semen present on the oral or

12        rectal swabs.

13   Q    And when you say "oral," do you mean the mouth?

14   A    That's correct, from the mouth.

15   Q    And do you know the blood type of Brian Butts?

16   A    Yes, I do.

17   Q    What is it?

18   A    He is Group O.

19   Q    And is he a secreter or a nonsecreter?

20   A    He is also a secreter.

21   Q    And can you tell the jurors what that means?

22   A    Yes.  A secreter is an individual who will secrete their

23        blood group substances, ABO blood substances, in their

24        body fluids; body fluids such as tears, sweat, saliva,

166

1     identified that that-- the presence of semen, indicating

2     there's blood group substances in that stain.

3   Q   And, Mr. Hayes, are there also other markings on the

4     shorts?

5   A   There were markings on the shorts, on the interior, were

6     the stains that I did some testing on, and there were

7     also markings on the exterior of the shorts.  I examined

8     the shorts also.  With dark material, sometimes it may be

9     hard to see stains.  We examine them with ultraviolet

10    light to look for semen stains.  I marked areas in which

11    I found fluorescence on the shorts, using the ultraviolet

12    light, did testing on those areas and did not identify

13    the presence of semen in those stains.

14  Q   Thank you.  Mr. Hayes, before you I have placed a pair of

15    jeans that have already been entered into evidence.  Did

16    you do any testing on these jeans?

17  A   Yes, I did.

18  Q   And can you tell us what it is that you did?

19  A   I did testing on -- I did a description of the jeans and

20    took notation of stains on the jeans.

21  Q   And what is it that you found, Mr. Hayes?

22  A   I found that the jeans had several stains on them,

23    several stains in the front thigh areas, the front of the

24    legs.  They were brownish stains, which appear to be soil

1    stains on the fronts -- on the front of the jeans.  There

2    were also several greenish stains on the front thigh

3    area, below the front zipper, and the front both thigh

4    areas of the jeans, and on the legs, the knee areas in

5    particular also, which appear to be grass or vegetative

6    stains.

7  Q  Thank you.  Did you do any testing on the shirt that was

8     provided to you?

9  A  I examined the shirt and did the description of the

10    thermal shirt that was provided to me.

11  Q  And what did you find with regards to that shirt?

12  A  I found that there were brownish stains on the rear right

13    of the shirt and on the interior abdominal area, which

14    appeared to be soil -- dirt stains.

15  Q  And with regards to the purple-flowered shirt, did you do

16    any testing on that shirt?  That would be your Item 11.

17  A  Item 11, I noted that there were some faint whitish

18    stains on the shirt.  And I did testing for the presence

19    of semen and I did not detect semen in those stains.

20  Q  And with regards to the sneakers, did you, in fact, test

21    the sneakers that were provided to you?

22  A  Yes, I did.

23  Q  And can you tell us about those results?

24  A  I examined the athletic shoes that were provided as the

168

1    shoes of William Curry and I found some brownish stains

2    on them.   I did not detect blood in those stains.

3                    MS. LYONS:  I have nothing further.  Thank you.

4                    MR. HOWARD:  May I inquire, your Honor?

5                    THE COURT:  Cross, Mr. Howard?

6                    MR. HOWARD:  Yes.

7

8                              CROSS-EXAMINATION

9

10   Q    Good afternoon, Mr. Hayes.

11   A    Good afternoon.

12   Q    Now, you told this jury that you went to the crime scene

13        on the date this incident occurred.

14   A    Yes, that's correct.

15   Q    And were you the one who discovered the toothbrushes?

16   A    Yes.

17   Q    So you found them?

18   A    Yes.

19   Q    And it wasn't found by a police officer who said, "Here's

20        some toothbrushes"?

21   A    The scene may have been examined at a time when they may

22        have been pointed out to me.  I collected the

23        toothbrushes.

24   Q    Okay.  From the ground?

187

1    A    No.  It was consistent with his secreter status and his

2         blood grouping.

3    Q    And eighty or one hundred million other people.

4    A    Yes.

5    Q    Okay.

6    A    At that same type of grouping, yes.

7    Q    All right.  Now, you also -- did you notice the presence

8         of any blood of Mr. Curry or any semen from Mr. Curry in

9         any of the items that you examined belonging to Brian

10        Butts?

11   A    No, I did not.

12   Q    Did you -- strike that.  Could you determine -- there

13        were a pair of shorts -- strike that.

14             Did you at any point determine how long any of

15        the stains that were on the clothing that you examined

16        belonging to Brian Butts had been on those garments?

17   A    No.  It's not possible to determine that.

18   Q    So it could be any length of time.

19   A    Well, certainly, it can't be ten years, twenty years, a

20        hundred years.  But certainly, I can't tell you when the

21        stains were deposited on those clothing no.

22   Q    All right.  Well, assuming for the minute that it wasn't

23        one hundred years or ten years, how far back could you go

24        to tell us how long those stains have been on that

173

1  A  The toothbrushes were submitted to the Latent Print

2  Section for fingerprint analysis.

3  Q  Do you know whether or not any prints of Mr. Curry was

4  identified on the toothbrushes?

5  A  Yes, I do know that.

6  Q  And was any fingerprints of Mr. Curry identified on the

7  toothbrushes?

8  A  There were no fingerprints found on the toothbrushes.

9  Q  Okay.  Now, you also took some soil samples, did you not?

10  A  Yes, I did.

11  Q  Can you tell the jury what you took and why?

12  A  I collected a small soil sample to compare to potential

13  soil samples that I found with the case -- associated

14  with the case.

15  Q  And that was done if you could match the soil in some

16  manner?

17  A  That's correct, yes.

18  Q  And how would you match the soil?

19  A  I would need to have a sample of soil, possibly from

20  shoes of someone at the scene that I would try to relate

21  to the soil of the sample -- the soil from the scene to

22  the soil collected from possibly the treads of shoes.

23  Q  Now, would that be restricted to just shoes?  Would you

24  also be able to look at soil stains from clothing and

40

1          (Brief pause.)

2               THE COURT:  There's a question from the jury.

3     It says, "We need the report of the detective and

4     lieutenant report," signed by the forelady of the jury.

5     I propose to write on the note that these reports are not

6     in evidence and therefore they may not have them, and

7     they must rely upon their collective memory of the

8     testimony to find the facts.  Is that agreeable?

9               MS. LYONS:  Yes, your Honor.

10              MR. HOWARD:  Yes.

11              THE COURT:  For the record, the jury came back

12    with an earlier question, which I talked with counsel

13    about in the lobby off the record.  Just so the record is

14    complete, the previous question was that the jury wanted

15    the map.  And counsel agreed that the map was not an

16    exhibit and therefore could not be sent to the jury, and

17    I made that notation on the note and sent that back to

18    the Jury Room.  Is that right, counsel?

19              MR. HOWARD:  Yes.

20              MS. LYONS:  Yes, your Honor.

21              THE COURT:  Why don't you stay right here and

22    I'll write something on this note and show it to you

23    before it goes over.

24              MR. HOWARD:  Thank you.

41

1                         (Brief pause.)

2                 THE COURT:  All right, counsel.  I've written,

3     "Members of the Jury:  The police reports were not

4     entered into evidence as exhibits and therefore I cannot

5     give them to you.  You must rely upon your collective

6     memory of the testimony to resolve this case," and I've

7     signed it.  Is that agreeable?

8                 MR. HOWARD:  That's agreeable, your Honor.

9                 MS. LYONS:  Yes.

10                THE COURT:  All right  Mr. Officer, please give

11    this note to the jury.  Please tell them to not destroy

12    it, but to maintain it with the papers in the case.

13                COURT OFFICER:  Sure, Judge.

14                MS. LYONS:  Thank you.

15                THE COURT:  Thank you very much.

16                MS. LYONS:  Thank you.

17                MR. HOWARD:  Thank you.

18                         (Recess)

19                (Assistant District Attorney Mary Gibbons

20    standing in for Ms. Lyons.)

21                MS. GIBBONS:  Your Honor, that's confusing.

22    That's actually not in --

23                THE COURT:  I told them that, but I'll tell

24    them again.  Rape of a child without force sometimes

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK,  SS.

SUPERIOR COURT
INDICTMENT NO(S)
SUCR  1996- 10963
SUCR 1996- 10693

COMMONWEALTH

Vs.

WILLIAM J. CURRY

CERTIFICATION OF SERVICE

I, William J. Curry, defendant / appellant herein, certify that on this date _____
_____ 2004,

I served a copy of the foregoing information and legal documentation by mailing same to
Assistant District Attorney, Tracy-Lee Lyons, Suffolk County District Attorney's Office, One
Bulfinch Place, Boston, MA 02114 and to Chief Justice Margaret H. Marshall,
Massachusetts Supreme Judicial Court, One Beacon Street, 3rd Floor Boston,
Massachusetts 02108-3106

_____
Defendant / Appellant
William J. Curry
Commitment No. W-65351

# Commonwealth of Massachusetts
## County of Suffolk
## The Superior Court

CRIMINAL DOCKET# **SUCR1996-10963**

RE:   **Commonwealth v Curry, William**

TO:   William Curry
c/o Old Colony Correctional Center
One Administration Road
Bridgewater, MA 02324

---

## CLERK'S NOTICE

This is to notify you that in the above referenced case the Court's action on 10/27/2004 is as follows:

Deft files pro-se: motion for writ of habeas corpus ad testificandum. (Ford, J. notified 10/22/04 incl w/docket sheets)

**Motion (P#65) denied. (Ford, J.)**

Dated at Boston, Massachusetts this 29th day of October, 2004.

John A. Nucci,
Clerk of the Courts

Location: CtRm 8 (Suffolk Courthouse, P.O. Square, Boston)

Emmanuel Foster,
#10233 - 424,
M. C. C. Chicago.
08/24/99.

Dear Sir,
Mr Hal, Garfinkel.
111. W. Washington,
CH. IL. 60606.


     I am one of Co-defender of Your client, Mr M. Black.
Which I' will Like to Set Some few things Straight.
     Firstly, I' Like to make sure that their no Problem between me and Your Client.
     Secondly, The whole thing was Started by Okorre Egelle and he mention your Client name, and by the time I' got to the Hotel, which I' have no other choice but to Co-operat with agent.
The Idea of the Phone call was brought up by the agent.
And everything I' say was written down by agent, I' ~~had I~~ wasn't sure who I' was Speaking to on the Phone either.
And I' explain everything in my proffer

I' will greatfully if you carefully look into this weather please.

C

Thank you for your co-operation and
looking forward to hear from you.

faithfully
E. Foster

Exhibit
#2
2 of 2

08-20-00

Dear Mrs Angela Black,

It my sincere to, hope that you and your children are safe and fine, and your husband is in good condition, Say hi to him next time you speak or when you write him and what happen was not any thing personal against him, it just that I was under a lot of pressure at that time, and I made the wrong Decision at that time, and most of those shits, I did not say it and it was made up but the FBI Agent. And I did wrote your husband lawyer explaining thing to him and what I told the truth, the true, is that I have never did any business or deliver any drug to him before, and Mr black and his lawyer should go check all the Court Docket Sheet, before my sentence and after sentence. And I am mad because Mr black the guy that mention his name, I didn't. The guy did. but I was a fool to fell for their shits and I have Explain everything before to the lawyer before, so he should check all over again with female lawyer and with the Court and his other lawyer

And I am in a bad shape My Self, I didn't
plans all this, My Mother need me and my father
is very ill, he already cost his right leg,
so it not just you guys that is going
through suffering, we just have to
pray that everything work out for the
best.
Like what I have been saying, What's it
that my block want me to do for him,
and so I can know, and I will Deside
what to do from there, but now you
didn't mention anything in your fax
you want me to do.
And tell him that everything happen like
that because most of my guys where
stupid and foolish, include me, I am
just sorry that we put him in trouble
like that.
I stop for now, God bless you and your
husband and your too sisters.
        Looking forward to hear from you!

                              Thank
                              Emmanuel

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK_____, ss

SUPERIOR COURT -5 P 12: 50

CRIMINAL ACTION
No. SUCR 1996- 10963
SUCR 1996- 10964

Commonwealth

v.

William J. Curry

*Denied — The defendant's previously filed motions for new trial have already been denied without a hearing.*

*Da You*
*10/25/04*

### MOTION FOR WRIT OF HABEAS CORPUS
### AD TESTIFICANDUM

Now comes, *Defendant*_____ And moves this Honorable Court to cause to be issued a Writ of Habeas Corpus to the superintendent of the Old Colony Correctional Center, or other custodians thereof, to produce you pro se and indigent movant before the Court for hearing, determination and disposition on

*Motion For ^A Evidentiary Hearing* Scheduled for *At Court's discreation*.

WHEREFORE, it is respectfully prayed this Honorable Court grant this Motion to protect the movant's right to be heard, or for any and all other reasons this Court may deem just and proper.

Dated: *10/5/04*

Respectfully submitted,

*William J. Curry*

P.S. Defendant is Requesting to Appear Before the Court, so that defendant can present evidence to Court to determine if an evidentiary Hearing should be held, as defendant is seeking A new trial.